## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RYAN RAMER AND JULIE MORALES, individually and on behalf of other similarly situated individuals, | **Collective Action** |
| Plaintiffs, | Civil Action No. |
| v. | |
| UTGR, INC. d./b/a TWIN RIVER CASINO, alias | **Jury Trial Demanded** |
| Defendant. | |

## COMPLAINT

### Introduction

1.      This is an action brought by Plaintiff Ryan Ramer ("Plaintiff Ramer") and Plaintiff Julie Morales ("Plaintiff Morales," collectively "Plaintiffs") against their current employer, UTGR, Inc., d/b/a Twin River Casino, alias ("Defendant"), seeking compensatory, liquidated, and punitive damages, attorneys' fees, costs, and other equitable relief arising out of violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* and the Rhode Island Payment of Wages Act ("RIPWA"), R.I. Gen. Laws § 28-12-1, *et seq.* and § 28-14-1, *et. seq.*

2.      With respect to the claims brought under the FLSA, this action is brought pursuant to the opt-in collective action provisions of the FLSA, 29 U.S.C. § 216(b).

3.      Additionally, and in the alternative, with respect to the FLSA and RIPWA claims, Plaintiffs bring this action as a multi-party action, separate and apart from the opt-in collective action claims set forth herein.

### Parties

4.      Plaintiff Ramer is a resident of the Town of West Warwick, County of Kent, and State of Rhode Island, and at all times relevant to this action was an employee—within the meaning

1

of 29 U.S.C. § 203(e)(1) of the FLSA and R.I. Gen. Laws § 28-12-2(5) of the RIPWA—employed by Defendant in the State of Rhode Island.

5.      Plaintiff Morales is a resident of the Town of Lisbon, County of New London, and State of Connecticut, and at all times relevant to this action was an employee—within the meaning of 29 U.S.C. § 203(e)(1) of the FLSA and R.I. Gen. Laws § 28-12-2(5) of the RIPWA—employed by Defendant in the State of Rhode Island.

6.      Defendant is a corporation duly organized under the laws of Delaware and doing business in the State of Rhode Island, with a principal place of business located at 100 Twin River Road in the Town of Lincoln, County of Providence, and State of Rhode Island.

## Jurisdiction

7.      The United States District Court for the District of Rhode Island has federal subject matter jurisdiction over this case under the provisions of 28 U.S.C. § 1331 because Plaintiffs assert claims arising under federal law; specifically, the FLSA, 29 U.S.C. § 201, *et seq.* Supplemental jurisdiction over the state law claims set forth herein is predicated on 28 U.S.C. § 1367 as they arise out of the same case or controversy.

## Venue

8.      Venue is proper in this Court insofar as Defendant is doing business in Rhode Island and therefore is deemed to reside in the District of Rhode Island, in compliance with the requirements set forth in 28 U.S.C. § 1391. Moreover, a substantial part of the acts and/or omissions giving rise to the claims asserted herein occurred in the District of Rhode Island.

## Material Facts

### FLSA Liability Allegations

9.      At all relevant times, Defendant was Plaintiffs' employer within the meaning of 29

2

U.S.C. § 203(d) of the FLSA and R.I. Gen. Laws § 28-12-2(6) of the RIPWA.

10.    Defendant is, and at all relevant times was, engaged in related activities performed through unified operation or common control for a common business purpose, and is, and at all times hereinafter mentioned was, an enterprise within the meaning of 29 U.S.C. § 203(r).

11.    At all relevant times, Defendant, on a regular, consistent and recurrent basis, as part of the Defendant's regular course of business of providing services and distributing product in interstate commerce, employed workers in the activities of said enterprise engaged in commerce or in the production of goods for commerce, including handling, selling or otherwise working on goods or materials that have been moved in or produced in commerce.

12.    At all relevant times, Defendant's enterprise has had an annual gross volume of sales made or business done in the amount of not less than $500,000.00.

13.    Therefore, Defendant is, and at all relevant times was, an enterprise engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. § 203(s)(1)(A).

## FLSA Collective Action Allegations

14.    Plaintiffs bring this action on behalf of themselves and all other similarly situated current and former employees ("Class Plaintiffs") of Defendant, who were and/or are affected by the actions, pay schemes, policies, and procedures of Defendant as described herein.

15.    In addition, Plaintiffs bring this action in their individual capacity, separate and apart from the collective action claims set forth herein.

16.    With respect to the collective action claims under the FLSA, Plaintiffs and Class Plaintiffs seek relief on behalf of one class consisting of two subclasses.

17.    **The FLSA collective action class** consists of two (2) subclasses which are defined

as follows:

1. **Floor Supervisor Subclass:** All individuals employed as Floor Supervisors (or other comparable positions including but not limited to Table Game Supervisors) who were employed by Defendant and were subject to the following common practices and/or policies of Defendant at any time from three (3) years before the filing of this Complaint to the present:

    a. Who were paid IRS Form W-2 compensation;

    b. Who worked more than forty (40) hours in a week; and,

    c. Who were not paid at least one and one-half (1 ½) times their regular rate of pay for all hours worked in excess of forty (40) in a week.

2. **Floor Manager Subclass:** All individuals employed as Floor Managers (or other comparable positions) who were employed by Defendant and were subject to the following common practices and/or policies of Defendant at any time from three (3) years before the filing of this Complaint to the present:

    a. Who were paid IRS Form W-2 compensation;

    b. Who worked more than forty (40) hours in a week; and

    c. Who were not paid at least one and one-half (1 ½) times their regular rate of pay for all hours worked in excess of forty (40) in a week.

18.    Plaintiff Ramer is similarly situated with other Floor Supervisors or other comparable positions including but not limited to Table Game Supervisors (collectively referred to as "Floor Supervisors") employed by Defendant in that they were all subject to the same payroll practices, policies and procedures of Defendant, performed similar work under similar working conditions, and were subject to the same unlawful practices alleged in this Complaint and sustained the same or similar damages as a result.

19.    Plaintiff Morales is similarly situated with other Floor Managers or other comparable positions (collectively referred to as "Floor Managers") employed by Defendant in that they were all subject to the same payroll practices, policies and procedures of Defendant, performed similar work under similar working conditions, and were subject to the same unlawful

practices alleged in this Complaint and sustained the same or similar damages as a result.

20.     Plaintiffs are similarly situated with the Class Plaintiffs.

21.     Plaintiffs and Class Plaintiffs reserve the right to amend said class and subclass definitions consistent with information obtained through discovery.

### General Allegations Common to Plaintiff Ramer and All Floor Supervisor Subclass Plaintiffs

22.     At all relevant times, Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs worked for Defendant as Floor Supervisors.

23.     At all relevant times, Defendant typically scheduled Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs to work one eight-hour shift each day that Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs worked for Defendant.

24.     For each and every shift that Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs worked for Defendant, Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs were required by Defendant to report to work for a meeting fifteen (15) minutes before Plaintiff Ramer's and Floor Supervisor Subclass Plaintiffs' shifts began ("pre-shift" meeting).

25.     During this fifteen (15) minute pre-shift meeting, one or multiple managers for Defendant would provide Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs with instructions relating to Plaintiff Ramer's and Floor Supervisor Subclass Plaintiffs' work-related duties.

26.     For each and every shift that Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs worked for Defendant, Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs clocked-in when Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs reported to the pre- shift meeting, and Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs clocked-out when they ceased working that particular shift.

27.     Defendant regularly required Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs to work at least six days per week from on or about June of 2013 until the present.

28.     Defendant regularly and routinely required Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs to work in excess of forty (40) hours each week from on or about May of 2013 until the present for various reasons, including due to the frequent requirement that Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs work six days per week and because of the requirement that they attend daily pre-shift meetings.

29.     From on or about May of 2013 until the fall of 2018, Defendant paid Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs a flat amount for each day that Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs worked for Defendant, regardless of how many hours Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs actually worked for Defendant during that day.

30.     At all relevant times, the employment arrangement between Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs and the Defendant did not provide a guaranteed minimum salary each week--Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs were paid by the day and only for those days actually worked.

31.     From on or about May of 2013 until the present, Defendant regularly and routinely issued and continued to issue payroll checks to Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs that did not include pay at a rate of one and one-half (1 ½) times the regular rate at which Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs were employed for hours worked by Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs in excess of forty (40) in a workweek.

**Primary Duties of Floor Supervisors**

32.     As "Floor Supervisors," Plaintiff Ramer's and Floor Supervisor Subclass Plaintiffs' primary job duties ("Supervisor Primary Duties") consisted of the following tasks.

a.   Reporting the actions of certain players to Plaintiff Ramer's and Floor Supervisor Subclass Plaintiffs' superiors so that Plaintiff Ramer's and Floor Supervisor Subclass Plaintiffs' superiors can determine whether to warn, discipline, and/or eject said players from Defendant's premises;

b.   Greeting players;

c.   Approving dealers' requests to exchange more than $100.00 for chips;

d.   Ensuring that dealers' racks are correct and accurate;

e.   Communicating to hosts if and when players became eligible for complimentary items so that hosts can arrange for complimentary items to be provided to said players;

f.   Assisting dealers in determining the amount of money to which players are entitled;

g.   Adding up the amount of money players won and lost and inputting this information in a computer, which Plaintiff Ramer's and Floor Supervisor Subclass Plaintiffs' superiors (i) check and oversee for the purpose of penalizing Plaintiff Ramer and Floor Supervisor Subclass Plaintiffs if said information is erroneous and (ii) report to authorities in accordance with law;

h.   Opening and closing tables;

i.   Stopping games when players win under certain circumstances, and notifying Plaintiff Ramer's and Floor Supervisor Subclass Plaintiffs' superiors of such winnings so that Plaintiff Ramer's and Floor Supervisor Subclass Plaintiffs' superiors can obtain certain information from players in accordance with law; and,

j.   Rating players' action on current gaming day by determining players' average bets versus time played.

**Allegations Specific to Plaintiff Ramer**

33.   Plaintiff Ramer has been employed by Defendant in the capacity of a Floor Supervisor since on or about May of 2013.

34.   Upon information and belief, from on or about June 1, 2013 until the present, Defendant regularly required Plaintiff Ramer to work in excess of forty (40) hours each workweek without the payment of overtime compensation for those hours in excess of forty (40).

35.   More specifically, upon information and belief, from on or about June 1, 2013 until the present, Defendant regularly and routinely required Plaintiff Ramer to work at least six days

per week.

36.     From on or about May of 2013 until the present, Defendant regularly and routinely required Plaintiff Ramer to work in excess of eight (8) hours during each shift, because of the requirement that he attend daily pre-shift meetings.

37.     Defendant regularly and routinely required Plaintiff Ramer to work in excess of forty (40) hours each week from on or about May of 2013 until the present for various reasons, including due to the frequent requirement that Plaintiff Ramer work six days per week and because of the requirement that he attend daily pre-shift meetings.

38.     From on or about May of 2013 until March of 2016, Defendant paid Plaintiff Ramer a flat amount of approximately $180 for each day that Plaintiff Ramer worked for Defendant regardless of how many hours he actually worked during that day.

39.     From on or about March of 2016 until September of 2018, Defendant paid Plaintiff Ramer a flat amount of approximately $205 for each day that Plaintiff Ramer worked for Defendant regardless of how many hours he actually worked during that day.

40.     From on or about September of 2018 until November of 2018, Defendant paid Plaintiff Ramer a flat amount of approximately $220 for each day that Plaintiff Ramer worked for Defendant regardless of how many hours he actually worked during that day.

41.     At all relevant times, Defendant did not provide Plaintiff Ramer with a guaranteed minimum salary each week—Plaintiff Ramer was paid by the day and only for those days actually worked.

**General Allegations Common to Plaintiff
Morales and All Floor Manager Subclass Plaintiffs**

42.     At all relevant times, Plaintiff Morales and Floor Manager Subclass Plaintiffs worked for Defendant as Floor Managers.

43.     At all relevant times, Defendant typically scheduled Plaintiff Morales and Floor Manager Subclass Plaintiffs to work one eight-hour shift each day that Plaintiff Morales and Floor Manager Subclass Plaintiffs worked for Defendant.

44.     For many shifts that Plaintiff Morales and Floor Manager Subclass Plaintiffs worked for Defendant, Plaintiff Morales and Floor Manager Subclass Plaintiffs were required by Defendant to report to work between twenty (20) and thirty (30) minutes before Plaintiff Morales's and Floor Manager Subclass Plaintiffs' shifts began to conduct meetings and other pre-shift work ("pre-shift" meeting).

45.     During this twenty (20) to thirty (30) minute pre-shift meeting, one or multiple managers for Defendant would provide Plaintiff Morales and Floor Manager Subclass Plaintiffs with instructions relating to Plaintiff Morales's and Floor Manager Subclass Plaintiffs' work-related duties and would require Plaintiff Morales and Floor Manager Subclass Plaintiffs to otherwise prepare for their shift by performing various duties including preparing staff changes, handling "call outs," moving staff as necessary and conducting meetings with the Floor Supervisors as necessary.

46.     For each and every shift that Plaintiff Morales and Floor Manager Subclass Plaintiffs worked for Defendant, Plaintiff Morales and Floor Manager Subclass Plaintiffs clocked-in when Plaintiff Morales and Floor Manager Subclass Plaintiffs reported to the pre- shift meeting, and Plaintiff Morales and Floor Manager Subclass Plaintiffs clocked-out when they ceased working that particular shift.

47.     Defendant regularly required Plaintiff Morales and Floor Manager Subclass Plaintiffs to work at least six days per week from on or about June of 2013 until the present.

48.     Defendant regularly and routinely required Plaintiff Morales and Floor Manager

Subclass Plaintiffs to work in excess of forty (40) hours each week from on or about May of 2013 until the present for various reasons, including due to the frequent requirement that Plaintiff Morales and Floor Manager Subclass Plaintiffs work six days per week, because of the requirement that they attend daily pre-shift meetings, and because they were often required to stay late if a table game did not close at the expected time.

49.     From on or about May of 2013 until the fall of 2018, Defendant paid Plaintiff Morales and Floor Manager Subclass Plaintiffs a flat amount for each day that Plaintiff Morales and Floor Manager Subclass Plaintiffs worked for Defendant, regardless of how many hours Plaintiff Morales and Floor Manager Subclass Plaintiffs actually worked for Defendant during that day.

50.     At all relevant times, the employment arrangement between Plaintiff Morales and Floor Manager Subclass Plaintiffs and the Defendant did not provide a guaranteed minimum salary each week--Plaintiff Morales and Floor Manager Subclass Plaintiffs were paid by the day and only for those days actually worked.

51.     From on or about May of 2013 until the present, Defendant regularly and routinely issued and continued to issue payroll checks to Plaintiff Morales and Floor Manager Subclass Plaintiffs that did not include pay at a rate of one and one-half (1 ½) times the regular rate at which Plaintiff Morales and Floor Manager Subclass Plaintiffs were employed for hours worked by Plaintiff Morales and Floor Manager Subclass Plaintiffs in excess of forty (40) in a workweek.

**Primary Duties of Floor Managers**

52.     As "Floor Manager," Plaintiff Morales's and Floor Manager Subclass Plaintiffs' primary job duties ("Manager Primary Duties," collectively with Supervisor Primary Duties, "Primary Duties") consisted of tasks identical to those of Floor Supervisors as detailed in

paragraph 32 plus the following differences and additional tasks:

a.   Serving as a "host" if and when players became eligible for complimentary items so that they can arrange for complimentary items to be provided to said players solely after 2:00 a.m.;

b.   Possessing access to additional information related to money players won and lost and processing and inputting information when a player wins more than 300 to 1 on a bet;

c.   Reviewing Floor Supervisors' slips and executing the same when tables are opened and closed; and

d.   Approving payouts of $5,000 or more.

**Allegations Specific to Plaintiff Morales**

53.   Plaintiff Morales has been employed by Defendant since on or about May of 2013.

54.   From May of 2013 through January of 2014, Plaintiff Morales was employed in the capacity of a Floor Supervisor.

55.   From January of 2014 through the present, Plaintiff Morales has been employed in the capacity of a Floor Manager.

56.   Upon information and belief, from on or about June 1, 2013 until the present, Defendant regularly required Plaintiff Morales to work in excess of forty (40) hours each workweek without the payment of overtime compensation for those hours in excess of forty (40).

57.   More specifically, upon information and belief, from on or about June 1, 2013 until the present, Defendant regularly and routinely required Plaintiff Morales to work at least six days per week.

58.   From on or about May of 2013 until the present, Defendant regularly and routinely required Plaintiff Morales to work in excess of eight (8) hours during each shift, because of the requirement that she attend daily pre-shift meetings and stay late when table games were not closed at the expected time.

59.     Defendant regularly and routinely required Plaintiff Morales to work in excess of forty (40) hours each week from on or about May of 2013 until the present for various reasons, including due to the frequent requirement that Plaintiff Morales work six days per week, because of the requirement that she attend daily pre-shift meetings, and because they were often required to stay late if a table game did not close at the expected time.

60.     In 2013, Defendant paid Plaintiff Morales a flat amount of approximately $185 for each day that Plaintiff Morales worked for Defendant regardless of how many hours she actually worked during that day.

61.     From December of 2013 through January of 2014, Defendant paid Plaintiff Morales a flat amount of approximately $200 for each day that Plaintiff Morales worked for Defendant regardless of how many hours she actually worked during that day.

62.     From January of 2014 through January of 2015, Defendant paid Plaintiff Morales a flat amount of approximately $215 for each day that Plaintiff Morales worked for Defendant regardless of how many hours she actually worked during that day.

63.     From January of 2015 through January of 2016, Defendant paid Plaintiff Morales a flat amount of approximately $222.88 for each day that Plaintiff Morales worked for Defendant regardless of how many hours she actually worked during that day.

64.     From January of 2016 through January of 2017, Defendant paid Plaintiff Morales a flat amount of approximately $231.80 for each day that Plaintiff Morales worked for Defendant regardless of how many hours she actually worked during that day.

65.     From January of 2017 through January of 2018, Defendant paid Plaintiff Morales a flat amount of approximately $245.71 for each day that Plaintiff Morales worked for Defendant regardless of how many hours she actually worked during that day.

66.     From January of 2018 through July of 2018, Defendant paid Plaintiff Morales a flat amount of approximately $250.62 for each day that Plaintiff Morales worked for Defendant regardless of how many hours she actually worked during that day.

67.     From July of 2018 through November of 2018, Defendant paid Plaintiff Morales a flat amount of approximately $288 for each day that Plaintiff Morales worked for Defendant regardless of how many hours she actually worked during that day.

68.     At all relevant times, Defendant did not provide Plaintiff Morales with a guaranteed minimum salary each week—Plaintiff Morales was paid by the day and only for those days actually worked.

**Employer Obligation to Either Pay Overtime or Prove an Exemption Applies**

69.     Both the FLSA and the RIPWA require employers to pay their employees at a rate not less than one and one-half (1 ½) times their regular rate of pay for all hours worked in excess of forty (40) in any one (1) workweek. 29 U.S.C. § 207(a)(1); R.I. Gen. Laws § 28-12-4.1.

70.     The FLSA and the RIPWA exempt, among others, certain "bona fide executive, administrative, or professional" employees from its overtime provisions. 29 U.S.C. § 213(a)(1); R.I. Gen. Laws § 28-12-4.3(a)(4).

71.     The aforementioned exemptions from the payment of overtime are "narrowly construed against the employers seeking to assert them and their application." *Arnold v. Ben Kanowsky*, 361 U.S. 388, 392 (1960).

72.     The burden of proving an exemption under the FLSA and the RIPWA is placed "upon the employer." *Martin v. Cooper Electric Supply Co.*, 940 F.2d 896, 900 (3rd Cir. 1991) (*citing Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 206 (1966)).

73.     To meet this burden, an employer must "prove facts by a preponderance of the

evidence that show the exemption is 'plainly and unmistakably' applicable." *Keen v. DXP Enterprises, Inc.,* No. 5:15-CV-137-OLG, 2016 WL 3253895, at *2 (W.D. Tex. June 6, 2016) (quoting *Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577, 581 (5th Cir. 2013)).

74.    The exempt or nonexempt status of any particular employee is determined on the basis of whether the employee's ***salary and duties*** meet the requirements of the U.S. Department of Labor wage and hour regulations. 29 C.F.R. § 541.2, *et seq*.

75.    A job title alone is insufficient to determine the exempt status of an employee. 29 C.F.R. § 541.2.

### Plaintiffs and Class Plaintiffs Are Not Exempt Employees

#### *Compensation Does Not Satisfy the Salary Requirement*

76.    For an employee to qualify as exempt under either the "executive" or "administrative" exemption, the employee must be "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week [$200 per week under the RIPWA] . . .." 29 C.F.R.§ § 541.100 and 541.200 and R.I. Gen. Laws § 28-12-4.3(a)(4).

77.    FLSA regulations provide that "[a]n employee will be considered to be paid on a "salary basis" . . . if the employee regularly ***receives each pay period*** on a ***weekly***, **or** *less frequent* **basis**, ***a predetermined amount*** constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. Subject to [certain exemptions], an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked." 29 C.F.R. § 541.602 (emphasis added).

78.    The regulations further provide that "[a]n exempt employee's earnings may be computed on an hourly, a daily or a shift basis, without losing the exemption or violating the salary

basis requirement, ***if the employment arrangement also includes a <u>guarantee</u> of at least the minimum weekly required amount paid on a salary basis*** regardless of the number of hours, days or shifts worked, and a reasonable relationship exists between the guaranteed amount and the amount actually earned." 29 C.F.R. § 541.604 (emphasis added).

79.    The "reasonable relationship" test is met "if the weekly guarantee is roughly equivalent to the employee's usual earnings at the assigned hourly, daily or shift rate for the employee's normal scheduled workweek." *Id.*

80.    Plaintiffs' and Class Plaintiffs' compensation fails to meet the definition of "salary or fee basis" because it is based on a <u>*daily*</u> fixed fee rate of payment, not a *"<u>weekly,</u> or <u>less frequent</u>"* basis. *Keen v. DXP Enterprises, Inc.,* 2016 WL 3253895, *4 ("[Paying] Plaintiff a predetermined amount for *each day* that he worked, is plainly inconsistent with [the 29 C.F.R. § 541.602(a)] requirement that the predetermined amount correspond to a 'weekly[ ] or less frequent basis,' not a more frequent—*i.e.*, daily—basis.")(emphasis added).

81.    Plaintiffs' and Class Plaintiffs' compensation also fails to meet the definition of "salary or fee basis" because they did not "receive the full salary for [every] *week* in which [they] perform[ed] any work without regard to the *number of days* or hours worked." 29 C.F.R. § 541.602(a) (emphasis added); *accord*, *Keen v. DXP Enterprises, Inc.,* 2016 WL 3253895, *4.

82.    Defendant's compensation scheme fails the salary test even if Plaintiffs and Class Plaintiffs actually received pay each week in an amount that satisfies the reasonable relationship test minimum (which in this case would be slightly in excess of $1,000.00 per week), because they were never *guaranteed* such payment in any week. *Keen v. DXP Enterprises, Inc.,* 2016 WL 3253895, *5 ("[A] claim that an employee actually was paid more than $455 each week is distinct from a showing that they were *guaranteed* to receive that amount.").

***Primary Duties Do Not Satisfy the "Executive" Exemption***

83.     Pursuant to 29 C.F.R. § 541.100 and R.I. Gen. Laws § 28-12-4.3(a)(4), in order for

Plaintiffs and Class Plaintiffs to have been employed by Defendant in a *bona fide* executive

capacity, in addition to satisfying the salary test, the following must have been true:

    a.     Plaintiffs' and Class Plaintiffs' "primary duty" must have been "management of the enterprise in which the [Plaintiffs and Class Plaintiffs were] employed or of a customarily recognized department or subdivision thereof;"

    b.     Plaintiffs and Class Plaintiffs must have "customarily and regularly direct[ed] the work of two or more other employees; and"

    c.     Plaintiffs and Class Plaintiffs must have had "the authority to hire or fire other employees" or Plaintiffs' and Class Plaintiffs' "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees" must have been "given particular weight."

*No "management" of Defendant's enterprise*
*"or of a customarily recognized department or subdivision thereof."*

84.     Plaintiffs' and Class Plaintiffs' Primary Duties never involved any of the following

activities recognized under 29 C.F.R. § 541.102 as indicia of management functions:

    a.     Interviewing, selecting, and/or training any of Defendant's employees;

    b.     Setting and/or adjusting any rate of pay and/or hours of work for any of Defendant's employees;

    c.     Maintaining production or sales records for use in supervision or control;

    d.     Appraising any of Defendant's employees' productivity and efficiency for the purpose of recommending promotions or other changes in status;

    e.     Handling complaints and grievances made by any of Defendant's employees;

    f.     Disciplining any of Defendant's employees;

    g.     Planning the work for any of Defendant's employees;

    h.     Determining the techniques to be used by any of Defendant's employees;

    i.     Apportioning the work among any of Defendant's employees.

    j.     Determining the type of materials, supplies, machinery, equipment and/or tools to

be used and/or merchandise to be bought, stocked and/or sold.

k.    Controlling the flow and distribution of Defendant's materials, merchandise, and/or supplies.

l.    Planning and/or controlling Defendant's budget; or

m.    Monitoring and/or implementing legal compliance measures.

85.    Accordingly, Plaintiffs' and Class Plaintiffs' primary duty was neither to manage Defendant's enterprise nor a customarily recognized department or subdivision thereof ("management prong").

*No "authority to hire or fire other employees" nor were "suggestions and recommendations" as to the hiring, firing, or other change of status given particular weight.*

86.    Plaintiffs and Class Plaintiffs were not expected by Defendant to, nor did Plaintiffs and Class Plaintiffs ever, review resumes submitted by individuals who had applied to work for Defendant.

87.    Plaintiffs and Class Plaintiffs were not expected by Defendant to, nor did Plaintiffs and Class Plaintiffs ever, interview individuals who applied to work for Defendant.

88.    Plaintiffs and Class Plaintiffs have never had any authority to hire any of Defendant's employees.

89.    Plaintiffs and Class Plaintiffs have never had any authority to fire any of Defendant's employees.

90.    Plaintiffs and Class Plaintiffs were not expected by Defendant to, nor did Plaintiffs and Class Plaintiffs ever, make suggestions and/or recommendations as to the hiring, firing, advancement, promotion or any other change of status for any of Defendant's employees.

91.    Accordingly, Plaintiffs and Class Plaintiffs primary duties did not include "the authority to hire or fire other employees" nor were their "suggestions and recommendations" as to the hiring, firing, or any other change of status "given particular weight" ("supervisory prong").

92.     Insofar as Plaintiffs' and Class Plaintiffs' primary duties do not satisfy either the management or supervisory prongs of the requirements set forth under 29 C.F.R. § 541.100 and R.I. Gen. Laws § 28-12-4.3(a)(4), they do not qualify as exempt employees under the "executive" exemption.

93.     Pursuant to 29 C.F.R. § 541.200 and R.I. Gen. Laws § 28-12-4.3(a)(4), in order for Plaintiff and Class Plaintiffs to have been employed by Defendant in a *bona fide* administrative capacity, in addition to satisfying the salary test, the following must have been true:

    a.    Plaintiffs' and Class Plaintiffs' "primary duty" must have been "the performance of office or non-manual work directly related to the management or general business operations of [Defendant] or [Defendant's] customers; and"

    b.    Plaintiffs' and Class Plaintiffs' "primary duty" must have included "the exercise of discretion and independent judgment with respect to matters of significance."

<u>*No performance of work "directly related to the management of general business operations" of Defendant or Defendant's customers.*</u>

94.     Any decision-making authority exercised by Plaintiffs and Class Plaintiffs related exclusively to production and/or the producing of Defendant's product, in this case recreational gaming services—not to management of the general business operations of the Defendant.[1]

95.     Plaintiffs' and Class Plaintiffs' Primary Duties related exclusively to the day-to-day provision of gaming services by the Defendant—specifically table games—at the customer level, literally the "ground floor" of service provision.[2]

---

[1] *See Dalheim v. KDFW-TV*, 706 F.Supp. 493, 506 (N.D. Tex. 1988) *aff'd*, 918 F.2d 1220 (5th Cir. 1990) (In determining whether plaintiffs' primary duties consisted of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers, "[t]he key factor . . . is whether the employee's activities focus on administrative-type work or on the production process itself. Production work is generally not considered to be directly related to management policies or general business operations, and thus fails to meet the administrative exemption.") *See also Cooke v. Gen. Dynamics Corp.*, 993 F.Supp. 61 (D. Conn. 1997) ("[T]he administrative/production dichotomy focuses not on whether an employee worked for an enterprise engaged in production activity, but whether the employee's primary duty was producing the product in question.")

[2] *See Ruggeri v. Boehringer Ingelheim Pharm., Inc.*, 585 F. Supp. 2d 254, 264 (D. Conn. 2008) (finding that the types of activities in which an employee must engage when performing his/her primary duty for the purposes of assessing whether such activities constitute "work directly related to the management or general business operations of the

96.    Plaintiffs and Class Plaintiffs were not expected by Defendant to, nor did Plaintiffs and Class Plaintiffs ever, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and/or similar activities. 29 C.F.R. § 541.201(b).

97.    Moreover, Plaintiffs' and Class Plaintiffs' Primary Duties never consisted of performing work directly related to the management or general business operations of Defendant's customers. 29 C.F.R. § 541.201(c).

98.    Therefore, when carrying out their Primary Duties, Plaintiffs and Class Plaintiffs were not required to perform office or non-manual work directly related to the management or general business operations of Defendant or Defendant's customers.

_No "exercise of discretion and independent judgment with respect to matters of significance."_

99.    In performing their Primary Duties, Plaintiffs' and Class Plaintiffs' work activities related exclusively to customer table game play.

100.    Plaintiffs and Class Plaintiffs possessed no authority to formulate, affect, or interpret Defendant's management policies or operating practices. 29 C.F.R. § 541.202(b).

101.    Plaintiffs' and Class Plaintiffs' Primary Duties consisted of carrying out routine activities bearing no significance to Defendant's general business operations.

102.    Plaintiffs' and Class Plaintiffs' Primary Duties did not involve carrying out major

---

employer or the employer's customers" are not activities which involve the day-to-day business that the employer specifically sells or provides, but instead, tasks, such as accounting, budgeting and the like, which every business must undertake in order to function; _See also Bratt v. County of Los Angeles, 912 F.2d 1066, 1070 (9th Cir. 1990)_ (holding that the "essence" of whether an employee's activities are directly related to the management or general business operations of the employer or the employer's customers means "the running of a business" or "determining its overall course or policies" and "not merely . . . the day-to-day carrying out of its affairs.").

assignments affecting or concerning Defendant's general business operations. 29 C.F.R. § 541.202(b).

103.    Plaintiffs' and Class Plaintiffs' Primary Duties did not involve making decisions for or on behalf of Defendant, at least not with respect to matters of significance.

104.    Plaintiffs and Class Plaintiffs possessed no authority to negotiate and bind Defendant on significant matters. 29 C.F.R. § 541.202(b).

105.    Plaintiffs and Class Plaintiffs never provided consultation or expert advice to Defendant's management. 29 C.F.R. § 541.202(b).

106.    Plaintiffs and Class Plaintiffs were never involved in planning Defendant's long-term or short-term business objectives. 29 C.F.R. § 541.202(b).

107.    Plaintiffs and Class Plaintiffs carried out requests and acted at the direction of supervisors with respect to any matters of significance.

108.    Moreover, in performing their Primary Duties, Plaintiffs and Class Plaintiffs had no authority to make an independent choice, free from immediate direction or supervision, at least not with respect to any matters of significance or with more than nominal discretion. 29 C.F.R. § 541.202(c).

109.    Plaintiffs and Class Plaintiffs shared information with their superiors pursuant to rules, standards, policies, and/or procedures espoused by Defendant—and their superiors would then make decisions based on this information on all significant matters.

110.    Plaintiffs' and Class Plaintiffs' Primary Duties did not involve the comparison and the evaluation of possible courses of conduct, and/or acting or making a decision after the various possibilities have been considered, at least not with respect to matters of significance or with more than nominal discretion. 29 C.F.R. § 541.202(a).

111.    To the contrary, Plaintiffs' and Class Plaintiffs' use of skill amounted to no more than applying well-established techniques, procedures or specific standards or criteria described in Defendant's operational manuals or other sources. 29 C.F.R. § 541.202(e).

112.    Indeed, for each of the duties comprising the Primary Duties of Plaintiffs and Class Plaintiffs described above, there is a specific procedure, standard, formula, and/or objective factors established by Defendant which essentially dictate any action or determination Plaintiffs and Class Plaintiffs are required to make, including when a matter is to be reported to a superior.

113.    The mere fact that Defendant could experience financial losses if Plaintiffs and Class Plaintiffs performed their job improperly does not mean that Plaintiffs and Class Plaintiffs exercised discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.202(f).

114.    Consequently, the Primary Duties performed by Plaintiffs and Class Plaintiffs did not and do not involve the management or administration of Defendant or the general business operations of Defendant nor did they or do they require the exercise of discretion and independent judgment with respect to matters of significance relative thereto.

115.    Accordingly, Plaintiffs and Class Plaintiffs were not employed by Defendant in a bona fide administrative capacity and therefore are not exempt from overtime requirements under the FLSA and the RIPWA.

**Failure to Pay Overtime Wages**

116.    Throughout their employment with Defendant, Plaintiffs and Class Plaintiffs regularly worked more than forty (40) hours each workweek.

117.    Despite the fact that Plaintiffs and Class Plaintiffs are non-exempt employees, Defendant failed or refused to pay Plaintiffs and Class Plaintiffs overtime pay on numerous

workweeks as required by the FLSA and the RIPWA.

118.    Defendant willfully and repeatedly violated the FLSA as well as the RIPWA by employing Plaintiffs and Class Plaintiffs for more than forty (40) hours per workweek without compensating them at a rate not less than one and one-half (1 ½) times the regular rate at which they were employed.

## Work Suffered or Permitted

119.    Defendant is liable for the payment of overtime wages for all hours over forty (40) that Plaintiffs and Class Plaintiffs were "suffered or permitted to work" in any one workweek—regardless of whether the work was requested, authorized or needed—whenever Defendant knew or had constructive knowledge that the work was being performed.[3]

120.    Defendant knew or had reason to believe that Plaintiffs and Class Plaintiffs were performing overtime work for which they were not being compensated at a rate not less than one and one-half (1 ½) times the regular rate at which they were employed.

121.    Moreover, Defendant knew or had reason to believe that Plaintiffs and Class Plaintiffs were working in excess of forty (40) hours per week on a regular basis.

122.    Accordingly, Defendant had constructive, if not actual, knowledge that Plaintiffs and Class Plaintiffs regularly performed overtime work for which they were not compensated.[4]

123.    Nevertheless, Defendant failed or refused to pay Plaintiffs and Class Plaintiffs the compensation to which Plaintiffs and Class Plaintiffs were legally entitled for all overtime hours

---

[3] As long as the employer knows or has reason to believe that its employee is continuing to work, that time is "work time," and the employee is entitled to the payment of wages from the employer for said time. *See* 29 C.F.R. § 785.11.

[4] An employer is said to have "constructive knowledge" of its employee's overtime work when it has reason to believe that its employee is working beyond his shift. *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306 (11th Cir. 2007).

worked.[5]

## Claims for Relief

124.    Plaintiffs and Class Plaintiffs incorporate the allegations in ¶¶ 1 through 123 above in each of the counts set forth below.

### Count One
### *Fair Labor Standards Act, 29 U.S.C. § 201, et seq.*

125.    Defendant, by its acts and/or omissions, including, but not limited to, those described herein, violated the FLSA by failing to pay overtime wages as provided therein, thereby causing Plaintiffs and Class Plaintiffs to suffer damages as aforesaid, for which they are entitled to relief pursuant to 29 U.S.C. § 216(b).

### Count Two
### *Rhode Island Payment of Wages Act,*
### *R.I. Gen. Laws § 28-12-1, et seq., and R.I. Gen. Laws § 28-14-1, et seq.*

126.    Defendant, by its acts and/or omissions, including, but not limited to, those described herein, violated the RIPWA by failing to pay overtime wages as provided therein, thereby causing Plaintiffs and Class Plaintiffs to suffer damages as aforesaid, for which they are entitled to relief pursuant to R.I. Gen. Laws § 28-14-19.2.

## Prayers for Relief

**WHEREFORE**, Plaintiffs pray that this Honorable Court grant the following relief:

1.    A declaratory judgment declaring that the acts and/or omissions of Defendant, including, but not limited to those complained of herein, are in violation of the FLSA and the RIPWA.

2.    An injunction directing Defendant to take such affirmative action as is necessary to refrain from such conduct as is necessary to ensure that the effects of these unlawful

---

[5] Once an employer knows or has reason to know that an employee is working overtime, ***it cannot deny compensation even where the employee fails to claim overtime hours or the work was not requested.*** *Holzapfel v. Town of Newburgh, N.Y.,* 145 F.3d 516 (2nd Cir. 1998); *Johnson v. RGIS Inventory Specialists,* 554 F. Supp. 2d 693 (E.D. Tex. 2007).

employment practices are eliminated and not repeated.

    3.     An award of compensatory damages.

    4.     An award of punitive damages.

    5.     An award of liquidated damages pursuant to 29 U.S.C. § 216(b).

    6.     An award of liquidated damages in an amount up to two times the amount of wages and and/or benefits owed pursuant to R.I. Gen. Laws § 28-14-19.2.

    7.     An award of reasonable attorney's fees and costs of litigation pursuant to 29 U.S.C. § 216(b).

    8.     An award of reasonable attorney's fees and costs pursuant to R.I. Gen. Laws §§ 28-14-19.2.

    9.     An award of other appropriate equitable relief pursuant to 29 U.S.C. § 216(b).

    10.    An award of other appropriate equitable relief or penalties pursuant to R.I. Gen. Laws § 28-14-19.2.

    11.    An award of such other and further relief as this Honorable Court deems just and proper.

## Demand for Jury Trial

Plaintiffs hereby demand a trial by jury on all counts so triable.

## Designation of Trial Counsel

Plaintiffs hereby designate Thomas J. Enright as trial counsel.

RYAN RAMER AND JULIE MORALES, individually and on behalf of other similarly situated individuals,

By their attorneys,

ENRIGHT LAW LLC

/s/ Thomas J. Enright
Thomas J. Enright (#7356)
696 Reservoir Avenue
Cranston, RI 02910
(401) 526-2620
(401) 457-7117 FAX
tom@enrightlawoffice.com

Dated: April 26, 2019